1  GARY M. RESTAINO
   United States Attorney
2  District of Arizona

3  JAMES R. KNAPP
   Arizona State Bar Number 021166
4  Assistant United States Attorney
   Two Renaissance Square
5  40 North Central Avenue, Suite 1800
   Phoenix, Arizona 85004-4408
6  Telephone: (602) 514-7500
   Email: james.knapp2@usdoj.gov
7  Attorneys for Plaintiff

8              UNITED STATES DISTRICT COURT

9                  DISTRICT OF ARIZONA

10
   United States of America,
11
                   Plaintiff,            **VERIFIED COMPLAINT FOR**
12   v.                                  **FORFEITURE *IN REM***

13   $17,820.00 in United States Currency,

14               Defendant *In Rem*.

15

16        Plaintiff United States of America brings this Complaint and alleges as follows in

17  accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules

18  for Admiralty or Maritime Claims and Asset Forfeiture Actions (Supplemental Rules):

19                    **NATURE OF THE ACTION**

20        1.      This is a civil action *in* rem, brought to enforce the provision of 21 U.S.C. §

21  881(a)(6) for the forfeiture of United States currency which represents money or other

22  things of value furnished or intended to be furnished in exchange for a controlled

23  substance, proceeds traceable to such an exchange, and money used or intended to be

24  used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§

25  801, *et seq*.

26        2.      This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. §

27  981(a)(1)(C) for the forfeiture of United States currency which constitutes or is derived

28  from proceeds traceable to a violation of a specified unlawful activity, including but not

    limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in interstate

commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7), and 1961.

3.     Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action.  This Court has jurisdiction.  28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

4.     The defendant consists of $17,820.00 in United States currency ("Defendant Property") seized on March 29, 2022.  The Defendant Property is currently in the custody of the U.S. Marshals Service.

## INTRODUCTION

5.     The following information depicts an investigation conducted by members of the Commercial Narcotics Interdiction Unit ("CNIU"), based out of the Phoenix Sky Harbor International Airport, to which members of the Drug Enforcement Administration ("DEA") and other law enforcement officers are assigned.  The primary responsibility of this unit is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6.     Based upon the experience of CNIU investigators and investigations across the country, it is common knowledge that cities located in the Midwest and on the East Coast are known demand locations for illicit drugs.  States such as Arizona and California are source locations due to their close proximity to the border of Mexico and established drug transportation routes.  Person(s) involved in the illegal drug trade often hire couriers to transport drugs and/or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies.  In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

7.      Factors that constitute suspicious flight itineraries include airfare purchase at the counter immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash.  Couriers travel with minimal or no luggage and will often attempt to board the aircraft at the last possible moment.  Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

## BACKGROUND

*Consensual Airport Gate Encounter*

8.      On March 29, 2022, a member of the CNIU received a ticket tip on an individual identified as Torry E. Allen ("Allen") who was traveling on a one-way ticket from Chicago, Illinois to Phoenix, Arizona.  Allen purchased his ticket within 48 hours of travel.

9.      A criminal history records check of Allen revealed earlier drug-related arrests and that he was currently on probation for a drug-related conviction. Investigators contacted Allen's probation officer and found that Allen did not have permission to travel to Phoenix.

10.     Based on this information, investigators decided to contact Allen. Investigators positioned themselves near the gate to monitor Allen's flight as it arrived in Phoenix to observe the passengers as they exited from the jet-way. Investigators intended to conduct a consensual encounter with Allen.

11.     Investigators met with Allen in an open concourse area and Allen confirmed his identity.

12.     An investigator received consent to speak to Allen.

13.     The investigator told Allen that due to the suspicious characteristics of his travel (a one-way ticket purchased within 48 hours of flight) he was identified as someone who may be traveling with illegal drugs or drug proceeds.

14.     Allen said he had to re-purchase his ticket last minute, because he had accidentally purchased a ticket to fly out on April 5, 2022 instead of March 29, 2022.

3

1    15.    Allen said he had a return trip scheduled for tomorrow.

2    16.    Allen said that other than medical marijuana he had legally purchased, there
3 were no other drugs in his duffle bag. Allen said there were no illegal drugs in his duffle
4 bag.

5    17.    When questioned about whether he had any large amounts of currency,
6 Allen said he had $18,000. When asked if that was precisely how much he had, Allen said
7 it was about $18,000, but it may be a little less than that. Allen said he intended to use the
8 money on a trip to Las Vegas. He said he was going to meet with a friend today in
9 Phoenix and go to Las Vegas tomorrow.

10    18.    Investigators received consent to search Allen's bag and found a large
11 amount of currency in it.

12    19.    The currency was bundled in what is commonly referred to as "quick
13 count" configurations, consisting of what appeared to be $1,000 stacks bundled together
14 by rubber bands.

15    20.    Drug traffickers commonly bundle currency in this manner. Doing so
16 allows them to more easily and quickly transport and identify currency amounts when
17 conducting drug transactions.

18    21.    Allen was asked about the source of the currency. Allen said he obtained
19 the currency from his employment with Amazon in Rockford, Illinois as a material
20 handler. He said he had worked there for the last three years and makes about $3,000 per
21 month. When asked if he withdrew the currency in his duffle bag from the bank, Allen
22 said no. He said he does not deposit large amounts of money in the bank. He said that
23 even though he had a bank account, he preferred to keep his money at home as cash
24 because banks had rules about withdrawing large amounts of cash at one time.

25    22.    The investigator said he would like to take the currency to the CNIU office
26 to count it. Allen protested and said he wanted to leave with his money.

27    23.    The investigator told Allen he could not leave, at which point Allen became
28 upset.

4

24.     The investigator asked Allen if he was on probation and Allen said no. The investigator told Allen his answer was false as their records showed he was currently on probation. Allen admitted he was on probation. He told the investigator he lied because he was nervous.

25.     The investigator continued to explain to Allen why the currency appeared to be suspicious.

26.     After initially declining to do so, Allen agreed to accompany investigators to the CNIU office to discuss the money that was discovered in his bag and to count it in a more private setting.

***Interview at CNIU Office***

27.     While at the CNIU office, Allen was asked about his employment at Amazon and his monthly expenses. Allen said he lived with his mother in Rockford, Illinois, paid about $700 per month for his car payment and car insurance, and paid another $700 to $750 for other monthly bills.

28.     Allen said he had worked with Amazon since September 2019 (about 2 ½ years), that he made $20.86 per hour, and was paid about $1,500 to $1,800 twice per month.

29.     Allen did show investigators a picture of an Amazon paystub on his phone for $700, but his name could not be seen on the picture of the paystub.

30.     Allen was asked to more specifically describe how he converts the money earned at Amazon into cash. Allen said he typically did not have his earnings put in his bank, Members Alliance Credit Union. He said when paid by Amazon his earnings are automatically put on his Amazon card by his employer. He said he withdraws the cash utilizing his Amazon card and keeps the cash at home. He said his Amazon card is not affiliated with Members Alliance Credit Union.

31.     Allen said he currently had about $3,000 in his Members Alliance Credit Union checking account, but that the currency in his duffle bag was cash from his home

5

and Amazon employment. He said the currency in his duffle bag was not ever in his Members Alliance Credit Union bank account.

32.    Investigators noted that they did not find any bank deposit documents, bank transaction receipts, or ATM receipts in Allen's duffle bag.

33.    A total of $17,820.00 in United States Currency ("Defendant Property") was found in Allen's duffle bag. The Defendant Property consisted of 10 $100 bills, two $50 bills, and 836 $20 bills.

34.    Investigators know from training and experience that withdrawals from banks are not typically made in varied denominations. They also are aware that $20 bills are the most common denomination used in drug transactions.

35.    Investigators found seven blank white Avery brand adhesive labels measuring approximately 5 ½ by 8 ½ inches in the duffle bag, consistent with those used for the shipment of drug-related packages.

36.    When asked about the purpose of the labels, Allen appeared flustered and nervous and said:

> "Uh (pause), these uh (pause), these bro (pause), this stuff is looking crazy bro I know, this is looking suspicious bro, I got a record label type stuff bro, and I just brought these printers like so long ago bro to the point they been in my bag just sitting there, I print my labels, was gonna print my labels and put 'em on there bro, just ain't took 'em out of the bag bro, that's all."

37.    A short time later Allen said that the labels were for his rapping business.

38.    When asked about the nature of his travel, Allen admitted he did not have a return flight purchased for tomorrow as he had earlier told investigators.

39.    Allen said he intended to go stay with his cousin Anthony Fleming ("Fleming") in Phoenix that night, and then the two of them would drive to Las Vegas the next day (March 30, 2022) and stay there for an undetermined amount of time. Allen said they had not yet reserved or paid for accommodations in Las Vegas. Allen also said he needed to be back to work by April 6, 2022.

40.     Allen stated that the reason he was going to Las Vegas was to gamble and show off by taking pictures he planned to post on social media.

41.     Allen provided Fleming's phone number to investigators. An investigator then went into another room to call Fleming.

42.     Allen immediately began texting on his phone. Investigators believe Allen was texting Fleming so the two of them could fabricate the same itinerary to give law enforcement.

43.     An investigator spoke to a man who claimed to be Fleming. Fleming said he and Allen were not cousins but were close friends. He said the two of them would be driving to Las Vegas tonight and would be returning tomorrow. Fleming reiterated that they were going to be in Las Vegas for just one night.  Fleming said their purpose in going to Las Vegas was to drink and party.

44.     Fleming was also found to have a criminal history, including a recent arrest in Phoenix where it appeared he was selling drugs at a bus stop.

45.     Investigators found many inconsistencies in what Allen and Fleming said.

46.     Allen originally told investigators that he was flying round trip and was not on probation. He later admitted he had not purchased a return flight and was actually on probation. He also said he was allowed by his probation officer to travel to Arizona, which was false.

47.     Allen said Fleming was his cousin while Fleming said he was Allen's close friend. Allen said they were driving to Las Vegas tomorrow while Fleming said they were going tonight. Allen said they were going to Las Vegas to gamble and show off on social media while Fleming said they were going to drink and party. Allen said they would be in Las Vegas for an underdetermined amount of time while Fleming said they would be there for just one night.

48.     Investigators know from training and experience that is common for those transporting drugs or drug proceeds to provide conflicting and inconsistent accounts regarding their travel and itinerary.

7

*Allen and Fleming's Criminal History*

49.    Upon information and belief, the following is a summary of Allen's arrests and convictions in Illinois:

      a.   09/23/2012 – Residential Burglary, Possession of a Stolen Firearm, Viol Timber Buying License Act.

      b.   06/11/2013 – Residential Burglary. Sentenced to 4 days jail and 3 years and 11 months probation.

      c.   02/16/2016 – Driving on Suspended License, Operate Uninsured Mtr Vehicle, No Valid Registration.

      d.   04/01/2016 – Mfg/Del Controlled Substances, Possession Controlled Substance, Driving on Suspended License, Operate Uninsured Mtr Vehicle, Improper Turn Signal, No Seat Belts.

      e.   07/19/2018 – Driving on a Suspended License, Obstructing an Officer, Poss Canc/Susp/Rvk/Lic/Permit, Resist Police Officer, Operate Uninsured Mtr Vehicle, Title/Reg Possession Offenses, Resist/PC Off/Corr Emp/FRFTR.

      f.   12/18/2018 – Ordinance.

      g.   09/20/2019 – Man/Del Control Substances (two counts), Possession of Methamphetamine. Sentenced to 180 days jail and 3 years probation.

50.    Upon information and belief, the following is a summary of Fleming's arrests and convictions:

      a.   10/03/2018 – Operating Without a License, Failure to Provide Vehicle Registration Certificate, Operating a Motor Vehicle With a False Plate (Indiana).

      b.   02/15/2022 – Obst Hwy/Pub Lic Thoroughfare, Lying or Sitting on Public Rig (Arizona).

8

51.     Investigators reviewed Fleming's February 15, 2022 incident and arrest (Phoenix Police Department Incident 2022-00249053).

52.     On that date, Fleming and another were suspected of selling fentanyl and marijuana at a bus stop. Ultimately, Fleming fled from police officers and is suspected of discarding narcotics as he ran. Fleming was apprehended and arrested for misdemeanor charges and resisting arrest. The other subject at the bus stop with Fleming was arrested for possession of narcotics for sale, possession of marijuana for sale, and resisting arrest.

***Allen's Financial Background***

53.     Despite Allen's claim of employment with Amazon since September 2019, according to the State of Illinois, Allen has had no reported income within the past three years.

54.     And, with this apparent lack of legitimate income, a records search of the Hertz rental car data base showed Allen still was able to rent a vehicle at the Los Angeles Airport in California on four separate occasions during a four-month period (January 2022 to April 2022). Those transactions are as follows:

>    a.   Rented a vehicle on 01/10/2022 at 12:51 p.m. and returned it to the same location on 01/11/2022 at 12:03 p.m.
>
>    b.   Rented a vehicle on 02/28/2022 at 9:53 a.m. and returned it to the same location on 03/01/2022 at 9:55 a.m.
>
>    c.   Rented a vehicle on 04/05/2022 at 1:35 p.m. and returned it to the same location on 04/06/2022 at 7:40 a.m.
>
>    d.   Rented a vehicle on 05/10/22 at 1:26 p.m. and returned it to the same location at 5:02 a.m.

55.     Though renting a car four times is not necessarily expensive, traveling to and being in California on four separate occasions when you live in Illinois, would be.

56.     Also, investigators know from training and experience that repeated short car-rental-turnaround times at an airport approximately 1,700 miles from your home

(Rockford, Illinois to Los Angeles, California) is suspicious and indicative of drug trafficking.

57.     Additionally, records from American Airlines showed that Allen flew on the following flights in 2021 and 2022:

1.     01/04/2021 ORD (Chicago) to PHX (Phoenix) via AA Flt 453

2.     01/06/2021 PHX to ORD via AA Flt 615

3.     01/24/2021 ORD to PHX via AA Flt 1041

4.     01/25/2021 PHX to ORD via AA Flt 1912

5.     03/29/2021 ORD to PHX via AA Flt 548

6.     03/30/2021 PHX to ORD via AA Flt 575

7.     05/03/2021 ORD to LAX (Los Angeles) via AA Flt 669

8.     05/31/2021 ORD to SFO (San Francisco) via AA Flt 2039

9.     06/03/2021 SFO to ORD via AA Flt 2614

10.     06/23/2021 ORD to LAX via AA Flt 669

11.     06/24/2021 LAX to ORD via AA Flt 1384

12.     06/28/2021 ORD to PHX via AA Flt 361

13.     06/29/2022 PHX to ORD via AA Flt 1969

14.     07/11/2021 ORD to LAX via AA Flt 669

15.     07/12/2021 LAX to ORD via AA Flt 2883

16.     08/08/2021 ORD to LAX via AA Flt 669

17.     08/09/2021 LAX to ORD via AA Flt 528

18.     09/13/2021 ORD to PHX via AA Flt 750

19.     09/14/2021 PHX to LAX via AA Flt 367

20.     09/28/2021 ORD to PHX via AA Flt 750

21.     09/29/2021 PHX to ORD via AA Flt 769

22.     11/02/2021 ORD to LAX via AA Flt 374

23.     11/04/2021 PHX to ORD via AA Flt 630

24.     01/10/2022 ORD to LAX via AA Flt 2242

10

25.     01/11/2022 LAX to ORD via AA Flt 2184

26.     01/25/2022 ORD to PHX via AA Flt 447

27.     01/26/2022 PHX to ORD via AA Flt 441

28.     02/08/2022 ORD to DFW (Dallas) via AA Flt 2428

29.     02/09/2022 DFW to ORD via AA Flt 1892

30.     02/28/2022 ORD to LAX via AA Flt 669

31.     03/01/2022 LAX to PHX via AA Flt 767

32.     03/02/2022 PHX to ORD via AA Flt 1859

33.     03/29/2022 ORD to PHX via AA Flt 2270

34.     04/05/2022 ORD to LAX via AA Flt 1029

35.     04/06/2022 LAX to ORD via AA Flt 475

36.     05/10/2022 ORD to LAX via AA Flt 2184

37.     05/11/2022 LAX to ORD via AA Flt 2431

58.     The majority of Allen's American Airline flights showed he flew from Chicago to far off locations (Phoenix, Los Angeles, and San Francisco) and returned to Illinois the next day.

59.     Investigators know from training and experience that it is common for drug-traffickers to make numerous, short, roundtrip flights from drug demand areas (such as Illinois) to drug source areas (such as Arizona and California).

60.     Investigators also know that those involved in drug-trafficking often display wealth, such as extensive travel and large amounts of currency, that are inconsistent with their legitimate income.

**Seizure of Defendant Property**

61.      Based on the above, the DEA seized the Defendant Property on March 29, 2022.

62.     On June 8, 2022, Torry Allen's attorney, Jacek Lentz, filed an administrative claim to the Defendant Property on Allen's behalf. In the claim Allen asserts he is the owner of the Defendant Property.

11

63.    On June 14, 2022, the DEA referred the case to the U.S. Attorney's Office in Phoenix and requested it initiate judicial forfeiture proceedings.

***Summary***

64.    Based on the following, it is believed the Defendant Property was the proceeds of, or helped facilitate, drug trafficking:

    a.  Allen purchasing a one-way ticket within 48 hours of his flight;

    b.  The large amount of currency found in Allen's duffle bag;

    c.  The denominations of the Defendant Property, which were made up primarily of $20 bills – the most common denomination used in drug trafficking;

    d.  The way in which the Defendant Property was bundled – rubber-banded in "$1,000 count" stacks of currency commonly used by drug-traffickers;

    e.  Allen's criminal history involving drug-trafficking, including a recent conviction in 2019;

    f.  Fleming's recent drug-related encounter with law enforcement;

    g.  Allen's conflicting statements. Allen told investigators he was flying round trip and was not on probation. He later admitted both were false. Allen falsely said his probation officer approved his travel to Phoenix and that he and Fleming were cousins. The probation office did not approve his flight to Phoenix and Fleming said they were friends. Allen and Fleming also gave different accounts of their Las Vegas travel plans;

    h.  Allen's lack of income for the last three years in the State of Illinois;

    i.  Allen's frequent presence and car rentals in California during a short time period; and

    j.  Allen's numerous, short, roundtrip flights from a drug demand area (Illinois) to drug source areas (California and Arizona).

**FIRST CLAIM FOR RELIEF**

Based on the aforementioned facts and circumstances, the defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**

The defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**NOTICE TO ANY POTENTIAL CLAIMANT**

If you assert an interest in the subject property and want to contest the forfeiture, you must file a verified claim that fulfills the requirements set forth in Supplemental Rule G. To avoid entry of default, a verified claim must be filed no later than thirty-five days from the date this Complaint has been sent in accordance with Supplemental Rule G(4)(b).

An answer or motion filed under Fed. R. Civ. P. 12 also must be filed no later than twenty-one days after filing the claim. The claim and answer must be filed in the United States District Court for the District of Arizona under the case number listed in the caption above and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

This notice provision does not provide you with any legal advice and is designed only to provide you with a general understanding of these proceedings. Any statements made in your claim or answer may be introduced as evidence against you in any related or

future criminal case. You should consult an attorney to represent your interests in this matter, and note that a stay of proceedings may be available under 18 U.S.C. § 981(g)(2).

IF YOU ARE A VICTIM, and have sustained economic loss as a result of the crime(s) giving rise to this civil action, you may be entitled to petition for remission, mitigation, or restoration under Title 28, Code of Federal Regulations ("C.F.R."), section 9.2. In lieu of filing a Claim with the Court, you may promptly submit a letter outlining your interest in the property to the undersigned Assistant United States Attorney. Plaintiff will notify you when it has received your letter, and further instructions may be provided upon conclusion of this action. The United States Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding under 18 U.S.C. § 981(d) and 21 U.S.C. § 881(d). If your status as a victim is contested, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

IF YOU ARE A LIENHOLDER, it is the policy of the United States Attorney's Office to honor all claims received from legitimate titled lienholders as defined under 28 C.F.R. § 9.2. In lieu of filing a claim with the Court, you may send a letter to the undersigned Assistant United States Attorney outlining your interest in the property, including: (1) the amount presently owed on the lien; (2) a copy of the security agreement setting forth your interest; and, (3) whether the owner is in default. If your lien is sufficient, Plaintiff will notify you to verify receipt of your letter. In the event of forfeiture, and to the extent practicable, proceeds from the sale and disposition of the subject property will be remitted to you in satisfaction of the lien. As noted above, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

1

### PRAYER FOR RELIEF

2          WHEREFORE, the United States of America prays that process issue for an arrest

3   warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all

4   parties to appear and show cause why the forfeiture should not be decreed; that judgment

5   be entered declaring the defendant property be forfeited to the United States of America

6   for disposition according to law; and that the United States of America be granted such

7   other and further relief as this Court deems just and proper, together with the costs and

8   disbursements of this action.

9          Respectfully submitted this 6th day of September, 2022.

10                                                      GARY M. RESTAINO
                                                        United States Attorney
11                                                      District of Arizona

12                                                      *S/James R. Knapp*
                                                        JAMES R. KNAPP
13                                                      Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28